UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-21992-CIV-COOKE/GOODMAN

DIANE WILLIFORD,

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

## ORDER ON PLAINTIFF'S ESI SPOLIATION SANCTIONS MOTION

This Order grants (but only in part) Plaintiff Diane Williford's spoliation sanctions motion concerning Defendant Carnival Corporation's inability to locate and produce x-rays which medical professionals took of Williford in an onboard medical clinic after she slipped and fell on allegedly wet and slippery exterior stairs aboard the Carnival *Dream* during a June 2016 cruise. The relief provided here, however, is (for now) more modest than the alternatives requested by Williford.

The harsh-type sanctions Williford urges here (such as an order establishing a disputed issue as a fact and an adverse inference) require bad faith -- which the Undersigned finds is not present on this record.

On the other hand, the reasons Carnival has proffered for the x-rays' loss or destruction arguably raise more questions than they answer. Saying that "a technical

problem" with both the x-ray machine and the computer previously attached to it caused the loss is a detail-free, vague response which a jury might want to consider in evaluating Williford's claim that she was unnecessarily evacuated from a ship because cruise ship medical staffers misread her x-rays and incorrectly concluded that she had a fractured hip.

Therefore, Williford will be permitted to present evidence about the loss or destruction of the x-rays (and the surrounding circumstances) in order to minimize the prejudice flowing from the unavailability of the x-rays. Carnival, however, will likewise be permitted to present evidence of the circumstances it believes demonstrate an innocuous reason for the inability to find the x-rays, and it may argue that it is not in any way at fault for the missing x-rays.[1]

But Williford will be given the choice to decide *whether* to use this remedy, as there could be some negative consequences flowing from it. This Order will provide the procedural specifics of Williford's choice after explaining why other sanctions are not warranted.

One final introductory point: Carnival can, at trial, prevent the introduction of evidence about the loss or destruction of the x-rays, and about its provision of a fuzzy, hazy explanation for the loss of the x-rays, by **stipulating** that (1) the x-rays did not

---

[1]    As explained by the Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 amendment, a court may enter an order "permitting the parties to present evidence and argument to the jury regarding the loss of information."

reveal a fractured hip and (2) Williford's medical evacuation expenses were proximately caused by a ship medical staffer incorrectly interpreting the x-rays as showing a fractured hip. Because there are no longer any medical malpractice claims in the case (procedural posture outlined below), a Carnival stipulation (if it were to be made) would still permit Carnival to challenge liability (e.g., it did not breach any standard of care concerning the allegedly slippery steps, or that Williford herself was negligent when she used the stairs).

If no stipulation by Carnival were to be given, then Williford will be permitted at trial to introduce evidence of Carnival's inability to produce the x-rays (including Carnival's detail-free explanation that a "technical problem" was responsible) and to argue why that factual scenario supports her theory that the $120,000 in expenses she incurred for being medically evacuated from the ship were medically unnecessary. Carnival, on the other hand, will be able, at trial, to introduce evidence explaining how and why the x-rays could not be located (including evidence to support its position that it is not at fault because the outside vendor it retained to install and maintain the x-ray machine aboard the *Dream* could not locate the images) and to argue against Williford's causation theory concerning those medical expenses.[2]

---

[2]     United States District Judge Marcia G. Cooke will be presiding over the trial and therefore will have the final say-so on evidentiary rulings. Thus, this Order is subject to any trial-related rulings which Judge Cooke enters before or during the trial.

**Factual and Procedural Background**

Williford's initial Complaint asserted only one count, for negligence. [ECF No. 1]. It alleged various subcategories of an alleged failure to provide reasonable care under the circumstances, but none of those specific allegations concerned medical malpractice. Instead, the Complaint, filed on May 26, 2017, concerning a June 7, 2017 incident, appeared to be a garden variety slip and fall lawsuit, with allegations of failures to inspect, clean, and maintain the stairs; failure to warn passengers; and failure to have a non-slip or non-skidding surface on or around the stairs.

The initial Complaint says nothing about Williford being medically evacuated off the ship, and it makes no allegations about medical malpractice. Similarly, it does not mention that Williford had x-rays taken on the *Dream*.

After obtaining an order permitting an amended complaint [ECF No. 36], Williford filed her First Amended Complaint on February 5, 2018 [ECF No. 37]. Her First Amended Complaint alleges that no x-rays were taken of her injury or that those taken were inadequate or negligently misinterpreted. It further alleged that the medical clinic staffers diagnosed her with a fractured hip but that the diagnosis was false. Because of this purportedly false diagnosis, Williford's First Amended Complaint alleged, (1) she was forced to spend the rest of the cruise strapped to a board and (2) proper treatment of her injuries was delayed.

The First Amended Complaint asserted eight counts, with the additional seven

counts arising from the activities of the ship doctor and nurses. It did not, however, affirmatively mention that x-rays were in fact taken, nor did it say anything about her medical evacuation from the ship.

Carnival filed a motion to dismiss the First Amended Complaint [ECF No. 48], and then, less than two weeks later, Williford filed her motion for sanctions [ECF No. 52] based on the so-called spoliation of the x-rays, which were now being mentioned for the first time. Her spoliation sanctions motion says she was medically evacuated to Broward Health, where medical personnel there took a CT scan which did not evidence the hip fracture for which she was diagnosed aboard the ship.

According to Williford's motion, "this strongly suggests that the shipboard diagnosis was a false diagnosis, and Plaintiff's pain, suffering, and being medevac'd were unnecessary and a breach of the duty of reasonable care." [ECF No. 52, p. 1]. The motion further alleged that "without the subject x-rays, Plaintiff's expert(s) cannot properly formulate opinions as to the reasonableness of the shipboard doctor's diagnoses, since the diagnosis was based on the x-rays." [ECF No. 52, p. 1].

Carnival's dismissal motion sought to dismiss all seven of the new counts because they were filed nearly eight months after the one-year deadline provided for in the passenger ticket contract. District Judge Marcia G. Cooke granted the motion and dismissed all seven counts with prejudice. [ECF No. 76].

Thus, the present procedural posture is that the case is proceeding only on the

one negligence count, without any of the medical malpractice-type claims.

Williford's sanctions motion, which Judge Cooke referred to the Undersigned [ECF No. 53] is fully briefed, with Carnival filing a response [ECF No. 62] and Williford filing a reply [ECF No. 66].

Carnival's opposition response to Plaintiff's spoliation sanctions motion attached the affidavit of Monica Petisco, a litigation representative. [ECF No. 62-3]. Petisco's affidavit says that the x-ray machine aboard the *Dream* is connected to a dedicated computer, which is used to view digital images of the x-rays. It also explains that the x-ray machine does not produce "hard copies" of the x-ray images on x-ray film. [ECF No. 62-3, p. 2]. Instead, the affidavit further notes, the x-ray images are "saved in digital format on the hard drive of the computer that is attached to the machine itself and used to view the images." *Id.*

The affidavit also says that the computer previously attached to the x-ray machine aboard the ship "was removed and replaced with a new computer." [ECF No. 62-3, p. 3]. It also explains that Carnival's outside vendor could not locate the x-ray images on either the computer presently attached to the x-ray machine aboard the ship or on the "broken hard drives from [the] old computer." *Id.*

Petisco's affidavit then contends that the x-ray images taken of Plaintiff "were lost due to a **technical problem** with the x-ray machine and the computer that was previously attached to it . . . ." *Id.* (emphasis supplied). The affidavit did not provide

6

any further explanation about what happened to the x-ray images, other than to contend that it was not the fault of Carnival or the medical personnel aboard the *Dream*.

The affidavit does not suggest the nature of the technical problem. It does not indicate whether the problem affected *all* x-rays taken by that particular x-ray machine or only the x-rays taken of Williford.  It does not explain whether someone working for Carnival caused the technical problem, whether someone working for the outside vendor was responsible for the technical problem, whether someone working for both Carnival and its vendor were responsible, or whether Carnival or its vendor have even identified the nature of the technical problem.

Similarly, the affidavit does not explain whether Carnival has provided similar explanations about missing or lost or destroyed x-rays in other personal injury or medical malpractice cases involving passenger patients who had x-rays taken by the very machine which Williford used.

The affidavit does not reveal whether an unavoidable event, such as a lightning storm at sea, caused the technical problem. It does not say whether the technical problem has been corrected. And it does not say whether the recovery center where the vendor brought the old computer was able to locate other x-ray images for patients other than Williford.

Perhaps most importantly, the affidavit does not explain whether (1) Carnival established a litigation hold for all x-rays on the computer after it was removed and

replaced with another computer; (2) if a litigation hold was complied with, and, if not, why not; (3) when the old computer was removed (to see if it was *after* this lawsuit had been filed); (4) whether the computer which was replaced contained information other than the x-ray images and, if so, whether that information was also lost or destroyed; and (5) why the hard drives from the old computer were "broken," as opposed to preserved,[3] and how they became broken.

In any event, notwithstanding the myriad questions remaining after Carnival submitted the affidavit, the Undersigned noticed that the motion, response, and reply discussed only the Court's inherent authority to impose sanctions for spoliated evidence when there is bad faith and that none of the memoranda discuss Federal Rule of Civil Procedure 37(e), which concerns failure to preserve electronically stored information. Therefore, the Undersigned required the parties to each submit a memorandum of law on the threshold legal issue of whether Rule 37(e), as opposed to

---

[3]     The affidavit states:

> Next, Mr. Cox [chief operating officer for Clinical Image Management Systems (CIMS), the outside vendor] located the physical computer that was previously attached to the x-ray machine onboard the *Dream*, which had been removed after the subject x-rays were taken on June 6, 2016. Mr. Cox took the old computer to a data recovery center and had them extract all of the information and data available on the **broken hard drives** from that old computer. However, Mr. Cox was still unable to locate the subject x-ray images for Plaintiff Diane Williford among any of the data that was recovered from the old computer.

[ECF No. 62-3, p. 3 (emphasis supplied)].

the common law, applies to the dispute over x-ray digital images stored on a computer hard drive, and, if so, to analyze the loss of ESI and whether any of the remedies or sanctions in the rule apply. [ECF No. 116].

Both Williford and Carnival submitted the required memoranda. [ECF Nos. 117; 118]. Both parties agree that the rule, and not common law notions of inherent authority, governs the dispute and controls the resolution of Williford's spoliation sanctions motion.

## Applicable Legal Standards and Analysis

The Undersigned is authorized to enter an Order, as opposed to a Report and Recommendations. "Even [where] a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Federal Rule of Civil Procedure 72(a). *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995); *see also QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 767, 683 n.2 (S.D. Fla. 2012) (explaining that magistrate judge has authority to enter a sanctions order, as opposed to a report and recommendations, when sanctions are denied).

Although this ruling is in an Order, the parties may, of course, pursue objections.

Pursuant to Rule 72(a), a party may object to a magistrate judge's decision of a nondispositive matter. Fed. R. Civ. P. 72(a). "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous

or is contrary to law." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(A). This standard of review is "extremely deferential." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co., Inc.*, No. 12-CV-81397-KAM, 2015 WL 11921411, at *1 (S.D. Fla. July 6, 2015) (citing *Tolz v. Geico Gen. Ins. Co.*, No. 08-80663-CIV, 2010 WL 298397, at *3 (S.D. Fla. Jan. 19, 2010)). "A finding is clearly erroneous only if 'the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed.'" *Sun Capital Partners*, 2015 WL 11921411, at *4 (quoting *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997)).

Or, as the Seventh Circuit has put it: "[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). "The mere fact that a reviewing Court might have decided the issue differently is not sufficient to overturn a decision when there are two permissible views of the issue." *Pendlebury v. Starbucks Coffee Co.*, No. 04-80521CIV-MARRA/JO, 2007 WL 4592267, at *1 (S.D. Fla. Dec. 28, 2007). "[T]he 'clear error' exception must be rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015).

Federal Rule of Civil Procedure 37(e) provides:

(e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps

to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1)     upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)     only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37 (emphasis added).

The Advisory Committee's notes to the 2015 amendment explain that the newly amended rule "forecloses reliance on inherent authority or state law to determine when certain measures would be used" for the loss of electronically stored information. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Rule 37(e) significantly limits a court's discretion to impose sanctions for ESI spoliations. As outlined in *In Re: Abilify (Aripiprazole) Products Liability Litigation*, it "authorizes courts to impose sanctions for destruction of ESI where four conditions are met." No. 3:16-md-2734, 2018 WL 4856767, at *2 (N.D. Fla. Oct. 5, 2018) (emphasis added).

First, as a preliminary matter, the rule applies only to ESI, so the first inquiry is whether ESI is what was lost. Assuming that the alleged spoliation does indeed involve

ESI, then three additional questions must be resolved. First, should the spoliated ESI have been preserved in the anticipation or conduct of the litigation? Second, is the loss of the ESI due to the party's failure to take reasonable steps to preserve the ESI? Third, can the ESI be restored or replaced through additional discovery? Fed. R. Civ. P. 37(e). Where the "[a]nswer to any of [the three] questions . . . is 'no,' . . . a motion for spoliation sanctions or curative measures must be denied." *Living Color Enters., Inc. v. New Era Aquaculture, Ltd*, No. 14-cv-62216, 2016 WL 1105297, at *4-5 (S.D. Fla. Mar. 22, 2016).[4]

The rule has two categories of relief: those in subsection (1) and the more-consequential ones in subsection (2). The sanctions available in subsection (2) require bad faith (i.e., the "intent to deprive"). But **both** categories of relief, including the "no greater than necessary to cure the prejudice" type in subsection (1), require that the preliminary four factors be established. The following points, all discussed in the Advisory Committee Notes, help inform the realistic, practical assessment of the third factor (i.e., whether the party "failed to take reasonable steps to preserve" the ESI).

Using the placement of issues discussed in the Advisory Committee Notes to the

---

[4]     The *Living Color* Court deemed the first question listed above (does the loss involve **ESI**, as opposed to other types of evidence, such as traditional paper documents or objects like a ladder or car tire) to be a preliminary, threshold issue which, if answered affirmatively, triggers the *next* three questions. The Undersigned has designated this initial inquiry to be the first of four questions. But regardless of the numbering system, the Undersigned is assessing the same factors used in *Living Color*.

2015 amendment, the following points assist the analysis:

1. The rule applies only to ESI and only when ESI is lost.

2. "Perfection in preserving all relevant electronically stored information is often impossible."

3. Similarly, the rule "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection."

4. The rule is "inapplicable when the loss of information occurs despite the party's reasonable steps to preserve."

5. "[I]nformation the party has preserved may be destroyed by events outside the party's control – the computer room may be flooded, a 'cloud' service may fail, a malign software attack may disrupt a storage system, and so on."

6. If ESI information is lost because a party failed to take reasonable steps to preserve it, then "the initial focus should be on whether the lost information can be restored or replaced through additional discovery." If the information "is restored or replaced, no further measures should be taken."

7. A court may resort to (e)(1) measures "only 'upon finding prejudice to another party from loss of the information.'"

8. The rule "does not place a burden of proving or disproving prejudice on one party or the other."

9. The more-stringent measures (deemed "specified and very severe") found in

(e)(2) rejects cases which "authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence."

10. "Negligent or even grossly negligent behavior" does not logically support the inference that lost evidence was "unfavorable to the party responsible for the loss or destruction of the evidence" because "information lost through negligence may have been favorable to either party, including the party that lost it."

11. Subdivision (e)(2) "does not include a requirement that the court find prejudice to the party deprived of the information" because the required intent finding also supports "an inference that the opposing party was prejudiced by the loss of information that would have favored its position."

12. Courts should use caution in using the (e)(2) measures. Finding the requisite intent does not require a court to adopt any of the (e)(2) measures. The "remedy should fit the wrong" and the "severe measures" should "not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss."

Now that the legal issues have been teed up, the Undersigned will address them in the order used in the rule itself.

First, there is little doubt that the digital x-ray images stored on a shipboard computer are ESI. Both parties agree with this fundamental point, and it would be difficult to argue otherwise. So the preliminary threshold issue (i.e., is ESI involved?) is

resolved with a "yes" answer. *See Sosa v. Carnival Corp.*, No. 18-20957, 2018 WL 6335178, at *11-15 (S.D. Fla. Dec. 4, 2018) (finding closed circuit television footage is ESI governed by Rule 37), *reconsideration denied*, 2019 WL 330865 (S.D. Fla. Jan. 25, 2019); *see also Jenkins v. Woody*, No. 3:15CV355, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017) (finding that video data, which was saved on the jail's server and then overwritten, constituted ESI).

The second issue is whether the x-rays should have been preserved in the anticipation or conduct of the litigation. Carnival contends that it had no duty to preserve the x-rays because "there is no evidence that any future litigation relating **specifically** to the medical care provided to Plaintiff by Carnival was probable or that any such litigation was looming against Carnival until well after the x-rays were lost." [ECF No. 117, p. 4 (emphasis in original)]. According to Carnival, it *might* have been under a duty to preserve the x-rays if Plaintiff had given it notice of a potential **medical** negligence claim. But, Carnival argues, because the original complaint was one for "simple premises liability," it had no duty to preserve the x-rays. Carnival further notes that the original complaint did not even mention that Plaintiff was cared for by Carnival's medical personnel.

Carnival does not cite any cases to support its view that it had no duty to preserve x-rays when its medical personnel took x-rays on board a Carnival ship of a passenger who slipped and fell and when it completed an incident report it says is

15

protected work product and when it was named as a defendant in the passenger's negligence lawsuit.

Not surprisingly, Williford contends that Carnival did have a duty to preserve the x-rays, regardless of whether it knew at the time that the claim was one for simple negligence or for medical negligence. Moreover, Williford points out that Carnival withheld, on work product grounds, a contemporaneous accident report. Carnival's objection to producing it says that the report "was prepared at the direction of counsel and in anticipation of litigation and is therefore protected by the work product privilege." [ECF No. 52-3, p. 10].

Carnival cannot have it both ways. It cannot, on the one hand, represent that a report prepared on the day of the incident was prepared in anticipation of litigation, but then, on the other hand, claim that an x-ray taken the same day did not have to be preserved. Given that Williford was treated at Carnival's onboard medical clinic because of injuries sustained when she slipped while on the cruise ship, Carnival would have been under a duty to preserve all the medical records for her treatment even if a medical malpractice claim had not been asserted. The duty arises regardless of the nature of the injury.

Under Carnival's apparent view of its duty (or, to be more accurate, non-duty) to preserve ESI or even non-ESI materials, it would not be required to preserve MRIs, blood test reports, records of prescription drugs being dispensed to passengers, medical

charts reflecting treatment and diagnosis, progress notes, or any other type of medical record created in the onboard clinic **unless the injured patient later pursued a medical malpractice claim.** This view, of course, would be wildly overbroad, illogical, and incorrect, but it would flow naturally from Carnival's argument.

By its own work product assertion, Carnival was "on notice" that "litigation [was] likely to be commenced."

Ironically, Carnival cites [ECF No. 117, p. 4] some authority for the proposition that the "requisite notice" (that the evidence is potentially relevant) occurs when "it can reasonably anticipate impending litigation – that is, litigation that has 'more than a possibility' of occurring – to which the evidence would be relevant." *Garcia v. United States*, No. EDCV 13-0112, 2014 WL 12709430, at *1 (C.D. Cal. Sept. 3, 2014) (quoting *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 523–24 (N.D. Cal. 2009)). Likewise, Carnival also relies on *Realnetworks* for the view that "'a general concern over litigation does not trigger a duty to preserve evidence,' because there is 'no duty to preserve relevant documents or evidence until a potential claim is identified or future litigation is probable.'" [ECF No. 117, p. 4 (citing *Realnetworks*, 264 F.R.D. at 526)].

The difficulty with Carnival's position here is that it is contrary to its earlier work product assertion in this very case. If a general concern over Williford's slip and fall is insufficient to trigger a duty to preserve evidence, then how can it be adequate to justify

the work product assertion?

And perhaps more importantly, Carnival's position is fundamentally at odds with positions Carnival has taken in many dozens of personal injury lawsuits filed against it in this district over the past few years. Indeed, based on the Undersigned's experience with Carnival litigation in this district, Carnival seems to *always* take the position that accident reports and incident reports prepared aboard the ship on or about the time of an incident are work product material which need not be produced in discovery.

For example, in *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 642 (S.D. Fla. 2011), Carnival asserted a work product objection over an accident report. It supported its claim with a declaration from Suzanne Brown Vasquez, the Guest Claims Manager for Carnival's Loss Prevention Department. *Id.* As explained by the *Bridgewater* Court,

> Ms. Brown recites that the experience of Carnival is that some passengers involved in accidents look for compensation for their injuries, and that exaggerated claims of accidents are frequently made. Her declaration includes the following:
>
> 5.    It is the **policy** of Carnival Cruise Lines to investigate **most** claims of passenger injuries **in anticipation of the litigation described above**. **When a passenger reports an incident resulting in injury**, an accident report is usually prepared and photographs are taken to memorialize the results of the investigation **in anticipation of litigation**. In addition, statements are taken from any witnesses to the incident. The accident report form utilized by Carnival was drafted by counsel for Carnival Cruise Lines and **every completed accident report**, all witness statements, as well as photographs taken at the time of the accident, are then provided to counsel for Carnival.

6.    These investigative procedures are followed by Carnival at the direction of Carnival's legal counsel, to provide claims handling information to Carnival Cruise Lines and defense counsel in the anticipated litigation.

7.    While it is Carnival Cruise Lines' policy to prepare an accident report, take photographs, and obtain witness statements in the case of every reported claim of passenger injury, their primary function is to assist Carnival Cruise Lines' claims department and defense counsel in litigation.

*Id.* at 642-43 (emphasis added) (citation omitted).

Consistent with the declaration Carnival submitted in *Bridgewater*, the Undersigned cannot recall any personal injury or wrongful death lawsuit against Carnival in which I was involved as a federal magistrate judge over the past nine years (when I took the bench) where Carnival did not assert work product to every incident report and accident report involving an injured passenger. That means one of two things: (1) Carnival does in fact reasonably anticipate litigation in every incident in which a passenger reports an injury and an accident report or incident report are prepared, or (2) Carnival simply *claims* that it anticipates litigation in every case involving an incident report in order to assert a work product theory, **regardless** of whether it actually anticipates litigation and even if it does not anticipate litigation.

If the second scenario is the accurate one, then that would likely demonstrate a scheme to routinely trick judges in this district to sustain non-existent work product claims over incident reports and other materials when Carnival did not reasonably

anticipate litigation.[5]

The Undersigned has not seen any evidence (in this case or any other Carnival case in which I have been involved) to suggest that Carnival or its counsel were engaged in such an unprofessional and unethical strategy. Therefore, I am left with the inherent inconsistency in this case: a work product claim over an incident report (a position which requires an anticipation of litigation) and an argument that Carnival had no duty to preserve because it had only a general concern over litigation and did not anticipate litigation from Williford as an actual potential claim.

The Undersigned doubts that Carnival has suddenly abandoned the work product protection theory it seemingly asserts over **every** incident report prepared when a passenger is injured by now switching to the view that the mere existence of a passenger report of injury is insufficient to anticipate litigation. Thus, the only logical explanation for this overarching dichotomy is that Carnival has asserted a theory here without adequately thinking through its potential consequences (in both this case and all other personal injury lawsuits brought by passengers).

---

[5]     The *Bridgewater* Court found that Carnival's accident report was work product and protected from disclosure by the work product doctrine. *Id.* at 643. According to a May 16, 2019 Westlaw search, 48 cases have cited *Bridgewater*. Several of these cases have involved Carnival. *See, e.g., Bounds v. Carnival Corp.*, No. 14-22197, 2015 WL 12712057 (S.D. Fla. Mar. 3, 2015) (upholding Carnival's work product claim over reports it prepared based on an affidavit from Ms. Brown which is similar, if not identical to, the declaration she submitted in *Bridgewater* and in other cases, such as *Alexander v. Carnival Corp.*, 238 F.R.D. (S.D. Fla. 2006), where the court set aside the magistrate judge's order compelling production after reviewing Ms. Brown's affidavit and finding that Carnival established the work product protection).

If the Undersigned were to agree with the argument Carnival now urges in its memorandum, then I would, on request from Williford, require Carnival to produce the incident report (because it would not have been prepared in anticipation of litigation). In addition, I would need to change my standard practice of upholding Carnival work product claims over incident reports (because the Brown declaration submitted in *Bridgewater* -- and perhaps other cases in this district -- would no longer be factually correct, as Carnival would be taking the position that it has only a general concern about litigation when a passenger reports an injury).

So the Undersigned concludes that Carnival **did** have a duty to preserve the x-rays, regardless of whether Williford brought only a negligence claim about falling on the step or also asserted a medical negligence claim about the purported "false diagnosis" of a fractured hip.

The third issue is whether the loss of the ESI is due to Carnival's failure to take reasonable steps to preserve the ESI.

Williford argues that Carnival "offers no explanation whatsoever for why it apparently took no measures to preserve the x-ray films" and "does not even offer speculative hypotheticals or theories as to how it might not have been at fault for losing these x-ray films." [ECF No. 118, p. 5].

Carnival, on the other hand, argues that the x-rays "were lost due to an unexpected technical issue that arose with the computer that was physically attached to

the x-ray machine onboard the *Dream*." [ECF No. 117, p. 6]. Conceding, as it must, that the x-ray images were not backed up or saved to any other remote system or database located off the vessel, Carnival stresses that the rule "does not call for perfection" and that its practices were reasonable. [ECF No. 117, p. 5].

The difficulty with Carnival's position, however, is that its explanation is nebulous and not particularly helpful. Carnival filed [ECF No. 64-1] Petisco's affidavit on March 26, 2018 -- almost four months after *Sosa v. Carnival Corp.* was decided, and more than three months after the *Sosa* Court denied Carnival's motion for reconsideration. *See Sosa v. Carnival Corp.*, 2018 WL 6335178, at *11-15, *reconsideration denied*, 2019 WL 330865. In *Sosa,* the Court noted that Carnival had proposed various possible explanations for the missing CCTV video, and the Court then rejected those theories as mere conjecture:

> To be sure, there might have been some sort of computer glitch. There might have been some sort of weather disturbance that interfered with the download attempt. And there might have been another Carnival employee who inadvertently deleted this CCTV video. But Carnival has not introduced any evidence suggesting that these are anything more than speculative possibilities.

*Sosa*, 2018 WL 6335178, at *19.

In the instant case, Carnival does not even offer one speculative hypothesis. Instead, it simply says it was not at fault because the vendor could not locate the x-rays after the computer was swapped out. But in addition to the questions which Carnival did not adequately answer or even mention in Petisco's detail-free affidavit (such as

what type of "technical problem" is responsible for the inability to retrieve the x-rays),
Carnival has failed to sufficiently address many other issues:

1.  What **specific** steps did the outside vendor take before concluding that it could
    not locate the missing x-rays?

2.  What particular reasons did the outside vendor rely on before concluding that
    nothing further could be done to track down the x-rays?

3.  Did the outside vendor consider but then reject (possibly for financial reasons)
    other possible steps to locate the missing x-rays?

4.  Did the outside vendor destroy (as oppose to lose or discard) the "broken" hard
    drive?

5.  How did the hard drive become "broken" and why would the mere substitution
    of one computer for another result in the destruction or corruption of data in the
    first computer's hard drive?

6.  If the hard drive from the first computer is in fact "broken" (or corrupted), then
    why is the outside vendor preserving it on a computer no longer being used?

7.  Who decided to remove the old computer from the ship in question and replace
    it with another, presumably newer, computer? Was it Carnival or the vendor or
    both?

8.  Was the computer replaced pursuant to a standard policy, such as, every
    computer gets replaced every two years or after 75% of the hard drive has been

used or whenever a new generation of hardware or software is available?

9.  If the removal/substitution was done pursuant to a policy, then was it a Carnival policy or a vendor policy?

10. Did other computers containing digital images of x-rays on other Carnival ships get replaced, and, if so, did any of the hard drives on the older computers also get damaged or corrupted or lost?

11. Who had access to the digital x-ray images of the computer at issue?

12. Did the x-ray images get damaged or corrupted or "broken" while the older computer was still on the ship, or did the damage occur after the new computer was installed on the ship?

13. Did Carnival have a policy to instruct its vendor to maintain and preserve digital x-ray images on computers when they were replaced with other computers?

14. Did Carnival instruct its vendor to preserve the images on the particular computer at issue, and, if so, was this in writing?

15. Did the computer at issue contain dozens, hundreds, or thousands of x-ray images, and how many images were lost, corrupted, or destroyed?

16. Did Carnival cross-reference its litigation and claims files to see if x-ray images at issue in other cases have been properly preserved?

17. Has Carnival ever, before this lawsuit, experienced a scenario where a patient's x-rays stored on a ship computer were lost, corrupted, or broken, and, if so,

when did that first happen and what steps did Carnival take to eliminate or minimize the chances of that circumstance happening again?

When posing these questions, the Undersigned notes that neither the rule nor the committee notes discuss the burden of proof for the question of whether a party (i.e., Carnival, in the instant case) took reasonable steps to preserve the ESI. Although the notes discuss the burden of proof for the *prejudice* factor, they do not have a similar analysis about which party has the burden (or if *any* party has the burden) on the preservation issue. The Undersigned grappled with this same question in *Sosa*, 2018 WL 6335178, at *16-17. The Undersigned adopts my *Sosa* analysis on the burden of proof issue here:

> Applying this principle of construction here, the committee's decision to explain that neither party bears the burden on the prejudice factor, but to then omit a similar explanation for the other Rule 37 factors, generates the presumption that the committee does not adopt that same no-burden-on-either-party approach for the other factors. Therefore, because neither Rule 37 nor the advisory committee's notes provide any guidance on which party has the burden on the issue of whether the party who lost the ESI took reasonable steps to preserve it, the Undersigned will use the approach that our Circuit uses when analyzing spoliation motions under the inherent-authority doctrine.
>
> In our Circuit, the party seeking spoliation s[anctions] has the burden to prove the common law factors. *See Walter v. Carnival Corp.*, No. 09-20962-CIV, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010). Following the 2015 amendment to Rule 37, other courts have placed the burden to establish the factors on the party seeking the sanctions. *See Jackson v. E-Z-GO Div. of Textron, Inc.*, No. 3:12-CV-00154-TBR, 2018 WL 3721385, at *4 (W.D. Ky. Aug. 3, 2018) (finding that plaintiffs (who were seeking spoliation sanctions) did not satisfy their burden of showing that defendant failed to take reasonable steps to preserve data files from a former litigation

database).

Thus, Sosa has the burden to establish that Carnival did not take reasonable steps to preserve the CCTV video footage.

*Id.* at *16-17.

So Williford has the burden to establish that Carnival did not take reasonable steps to preserve the x-ray digital images.

The Advisory Committee Notes to the 2015 amendment point out that "the court should be sensitive to the **sophistication** with regard to litigation in evaluating preservation efforts." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (emphasis added). Carnival is obviously a sophisticated litigant, and it is experienced with spoliation sanctions motions and the need to preserve evidence, including ESI. Indeed, as of the time it submitted the Petisco affidavit and its memorandum, Carnival was already on the wrong side of two orders in *Sosa* and should have realized that a vague affidavit about missing or destroyed ESI would be problematic.

Moreover, those same notes also explain that "a party urging that preservation requests are disproportionate may **need to provide specifics** about these matters in order to enable **meaningful discussion** of the appropriate preservation efforts." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (emphasis added). Given Carnival's sophistication and its experience in *Sosa*, the Undersigned views the lack of specifics to be significant.

As outlined above, Carnival did not provide much in the way of specifics.

Rather, the explanation it did provide was not satisfying and, in many ways, triggered more uncertainty than it resolved.

Determining whether Carnival's loss of the images from the replaced hard drive on the old computer reflects a bad faith intent to deprive Williford of the x-rays concerns a different issue than assessing whether Carnival took reasonable steps to preserve it. It is entirely possible that Carnival did not act reasonably, but that it lacked the bad faith intent to deprive her of the evidence.

Similar to the analysis I used in *Sosa*, I need not now engage in a fine-tuned analysis and determine whether Carnival acted in a grossly negligent, reckless, or merely negligent way. At this point, all that is necessary for possible Rule 37(e) sanctions is to conclude that Carnival did not act "reasonably" to preserve the ESI. The Undersigned makes that finding.

Carnival has not offered any evidence about the circumstances surrounding the loss or destruction of the x-ray images. Unlike its strategy in *Sosa*, it does not proffer any specific theories, speculative or otherwise. Rather, it simply says that the outside vendor could not locate the images on the "broken" hard drive due to some unspecified "technical" problem.

Under these circumstances, the Undersigned finds that Carnival did not take reasonable steps to preserve the x-ray images.

The fourth threshold issue that must be resolved before Rule 37(e)(1) or (2)

remedies are activated is whether the CCTV footage "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). This is a straightforward question and does not require much analysis: there were no other x-rays taken on the ship to confirm whether Williford fractured her hip. Recollection testimony from doctors or nurses is not an adequate substitute for the actual x-ray image, especially when Williford contends that she incurred more than $120,000 in expenses for an unnecessary medical evacuation caused by a misreading of the x-rays.

Now that the Undersigned has concluded that the four prerequisite factors have been established, I must determine whether there is prejudice to Williford. If there is not, then no remedial measures may be ordered. And if I do find prejudice, then I cannot enter the harsher remedies of subsection (2) unless Carnival "inten[ded] to deprive [Williford] of the [x-rays'] use in the litigation." Fed. R. Civ. P. 37(e)(2).

The missing x-rays prejudice Williford. Their absence makes it more difficult for her to successfully and strategically demonstrate to the jury that the medical evacuation expenses were caused by an incorrect interpretation of the x-rays. Therefore, I am permitted to (but not required to) "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

However, I do **not** find that Carnival had the intent to deprive Williford of the x-ray images. Carnival was not aware of the significance, if any, of the x-rays until after an amended lawsuit was filed. Carnival may have been reckless in not taking adequate

steps to preserve the x-ray images, and it may have even been grossly negligent. But that does not equate to an intent to deprive.[6] Therefore, I am permitted to only enter measures under subsection (1).

In an effort to provide relief to Williford without unduly prejudicing Carnival, which did not intend to deprive Williford of the x-rays, the Undersigned concludes that Williford may present evidence so that the jury understands the facts (or lack of facts) surrounding Carnival's failure to provide the x-rays.

From a common sense, practical perspective, the Undersigned acknowledges that Williford might not want the jury to hear the evidence because that evidence might cause some or all of the jurors to sympathize with Carnival's it's-not-our-fault position. As the party who is seeking remedies but who is not responsible for the loss or destruction of the x-rays, Williford will have a choice:

(1) She can have *all* the evidence currently on this record about the loss of the x-rays and their unavailability presented to the jury, **or**

(2) She can prevent Carnival from introducing evidence about the circumstances surrounding the loss of the x-rays and simply have the Court advise the jury that

---

[6]       In *Sosa*, I ruled that the intent issue would be presented to the jury. But the facts there were far-more unusual and suspicious then the ones here. For example, the Carnival security officer who claimed to have viewed the CCTV video before it went missing failed to complete his investigation for reasons unknown and never explained. Moreover, although that officer interviewed witnesses, he later noted that the incident was "non-reportable," and Petisco (who also submitted an affidavit in *Sosa*) did not know why.

Carnival had the images at one time, but they are no longer available.

Finally, Carnival can avoid both alternatives by agreeing to the stipulation outlined earlier in this Order.

To avoid any delay and to minimize any confusion, Carnival shall, by May 31, 2019, file a notice on CM/ECF advising the Court of its position on the possible stipulation. If Carnival does not agree to the stipulation, then Williford shall advise the Court of her position in writing within two weeks of the filing of Carnival's notice.

In addition, Judge Cooke, who will preside over the trial, will be the final arbiter of another potential remedial measure: whether the Court should "giv[e] the jury instructions to assist in its evaluation of such evidence or argument [concerning the loss of the x-rays]." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on May 28, 2019.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>Copies furnished to:</u>
The Honorable Marcia G. Cooke
All counsel of record